SIMEON BROLASKY, appellant, and WALTERS B. MILLER and others, respondents.

A purchaser of land at Sheriff's sale on judgment and execution at law subject to a mortgage may take advantage of usury in the mortgage.

A mortgagor, a defendant in a foreclosure suit, the mortgaged premises having been sold by the Sheriff under judgment and execution against him, is a good witness, in the foreclosure suit, for the purchaser at the Sheriff's sale, a defendant in the foreclosure suit, to show usury in the mortgage.

Usury should be strictly proved. It is not sufficient for the party who sets it up to. make out a probable case.

The case in Chancery is reported *ante,* page 626.

*R. P. Thompson* and *P. D. Vroom* for the appellant.

*W. Halsted* for the respondent.

POTTS, J.  The appellant, who was the complainant in the Court below, filed the bill to foreclose a mortgage on certain premises called The Washington House, at Cape Island. The mortgage was given by Clark and wife to Brolasky for $2,800, and is dated May 18, 1846.  Subsequently to the giving of the mortgage several judgments were obtained against Clark, upon which executions were issued, the premises sold at Sheriff's sale, and Walters B. Miller and Joseph Ware became the purchasers, subject to the above mentioned mortgage.  To this bill filed by Brolasky to foreclose his mortgage, Miller and Ware put in an answer setting up usury in the inception of the mortgage.  Testimony was taken, the cause heard, and the Chancellor, being of opinion *t*hat the complainant was not entitled to the relief sought, dismissed the bill with costs, from which decree the complainant took this appeal.

Three questions were made upon the argument.  1. Was it competent for Miller and Ware, purchasers, who bought the premises subject to this mortgage, to set up this defence against the mortgage?  2. Was Clark, the mortgagor, (who was a wit-

ness in the defence) a competent witness to prove the usury ? And 3. Was the defence made out?

The two first of these questions were before the Court of Chancery in the case of *Canning v. Wire* 2 *Hal.' Ch. R.* 73, and were both settled affirmatively. *Lloyd v. Scott,* 4 *Peters* 205, and *Green v. Kemp,* 13 *Map.* 515, are cases in point upon the first question. I concur in the opinion delivered by the Chief Justice upon these points.

The third question remains. And upon a careful examination of the evidence in support of the defence set up in the answer, I am unable to reach the conclusion that it is made out. Usury should be strictly proved. It is not sufficient for the party who sets it up to make out a probable case. We cannot undertake to guess away men's rights upon vague or doubtful testimony.

The defence depends almost, indeed I may say entirely, on the paper exhibits in the cause, and the testimony of Clark and Burk. The man who borrowed the money, and the man who acted for him in making the contract, are the chief witnesses.

There is no doubt that Clark paid a bonus for the money ; but the question whether it was paid, in fact, to Burk for *procuring,* or to Brolasky for *making* the loan, is, to say the least, involved in mystery.

It appears that early in 1846 Clark, being then the owner of this Washington House property at Cape Island, was a good deal in debt and pressed for money. Burk and Wineberner had a mortgage upon the property for $800, and Flanagan had another for $600, and the money was wanted on both. Under these circumstances Clark applied to Burk to negotiate a loan for him. He wanted $3,000 to relieve his present necessities.

Clark says, in his testimony, that Burk had the control of both these mortgages ; and that in the negotiations for the loan he (Burk) made all the agreements and did all the bargaining. " I never (he says) had anything to do with Mr. Brolasky about the negotiation or about the bonus. I never made any agreement with Mr. Brolasky that I would pay him $100 as a bonus for the loan. I never applied to Mr. Brolasky to make me a loan.

The result of Mr. Burk's negotiation was, as it would appear

upon the face of the papers, that he sold the Burk and Wine-berner and the Flanagan mortgages to Brolasky ; that Brolasky received a mortgage from Clark on the above mentioned property for $2,800 ; and that he turned in these two mortgages at their face as part of the consideration money.

The Brolasky mortgage appears to have been executed by Clark and wife at Cape May on the 18th May, 1846 : it was acknowledged on the same day, but not recorded until the 25th of the same month.    Burk and Brolasky lived in Philadelphia ; Clark at Cape Island.    The bond and mortgage were probably executed at Cape Island  and sent  up to Philadelphia  in antici-pation of the negotiation being completed.    Clark says nobody was present at its execution but himself, wife, and Brognard, the Master before whom the acknowledgment was taken.

On the 22d May it appears, from a receipt produced, that Burk received from Brolasky his two notes of that date, at 30 days, one for $500, the other for $800, *on account* of the mortgage of Burk and Winebrener of $800, and the Flanagan mortgage of $600, agreeing at the same time to have the said mortgages *as-signed to Brolasky* if required by him.    And powers of attorney were executed on the same day from Burk & Winebrener and Flanagan to Brolasky, authorizing him to *acknowledge satisfac-tion* on these two mortgages.

Upon the face of this transaction it is a sale of these two se-curities by the holders to Brolasky, and an acknowledgment of the receipt of his notes, on account, to the amount of $1,300.    It does not appear that Clark had anything to do with it, or that it had anything to do with the $2,800 mortgage, subsequently re-ceived by Brolasky from Clark.    I say subsequently, for there is no evidence that Brolasky had the $2,800 mortgage until three days afterwards, the 25th, when he put it on record.

The holders of these two mortgages had a right to sell, and Brolasky to buy them at a discount.    That is not so unusual a transaction as to awaken suspicion.    Mr. Clark's interests were in no way affected by it.    Brolasky got them, perhaps, for $1,300, less thirty days' interest.    There was, at the time, $1,466.30 due upon them for principal and interest.    They were

turned over to Clark at that sum on account of the $2,800 mortgage. But there is no usury in this. This was the first item which went to make up the $2,800.

The second item was a lot of goods furnished by Brolasky to Clark, amounting, as Clark swears, to *upwards* of $800. There is no evidence that these goods were charged at more than the market price. Clark makes no such statement. It appears he selected them himself from Brolasky's stock, and such as he wanted and the stock did not furnish, Brolasky went out and purchased for him to make up the bill.

The third item was a note for $516, given by Brolasky to Burk, to pay a note Clark owed him; and this, with $10 paid to Brognard, for drawing the bond and mortgage, as per Burk's testimony, makes up the $2,800, allowing the bill of goods to have amounted to $807.70.

On the 25th of May, the three mortgages, to wit, the Burk & Winebrener, the Flanagan, and the Brolasky mortgages, were taken to the Clerk's office in Cape May. A memorandum of that date is indorsed on the back of the two first, by the Clerk, certifying that he had that day canceled the said mortgages on the records of the county, and a similar memorandum was made by him on the back of the powers of attorney. At the same time the Brolasky mortgage was put upon record.

Now as between Clark and Brolasky, upon the face of this transaction, it would appear that Clark received,

1. The two mortgages of Burk & Winebrener and
    Flanagan, satisfied of record, amounting to    $1,466.30
2. Merchandize, sworn by Clark at upwards of
    $800, say   -      -      -      -            807.70
3. Note to pay debt due by him to Burk   -        516.00
4. Expense of drawing papers   -      -           10.00
                                                  _____
Making the exact amount of the mortgage   -     $2,800.00

The amount due upon the two canceled mortgages is ascertained by actual calculation. The charge for merchandize is not controverted by the evidence, and the amount may fairly be estimated from Clark's evidence, at the sum at which it is put

down. As to the note, Burk says it strikes him it was $516. He says: " Clark owed me the $516 for a piece of property; for that I had his note; and the note was paid me by Brolasky giving me his note. That canceled so much of the money due from Clark to me."

Now the main ground upon which the defendants rest their allegation of usury, is the transaction in regard to the sale of the Burk & Winebrener and Flanagan mortgage. There was $1,466.30 due on them, and Burk appears to have received only Brolasky's notes for $800 and $500, at thirty days, as the consideration for them. And Burk says, " in *my* settlement with Mr. Clark *I* did not allow him any more than the proceeds of these notes." And Clark in his testimony says, " when Mr. Burk and I settled, after he had negotiated the loan of Mr. Brolasky, *he* deducted a bonus of $100, which I allowed *him*."

Clark, as we have seen, had nothing to do with the negotiation with Brolasky. That was managed entirely by Burk, who states that he was Clark's agent in the transaction. Mr. Burk's testimony then, might be expected to throw light upon the nature of the contract. But it does not. He seems strangely to have forgotten all the most material parts of the transaction. He does not even remember the sale of the two mortgages, the receipt, or the execution of the powers of attorney; and he does not undertake to swear expressly that he ever paid or allowed Brolasky a bonus for lending the money. He makes a case out of which we may *guess* that there was usury, but takes care that we shall not do it upon *his direct reponsibility*. He says Brolasky " *mentioned* a discount of five per cent." He says, " At the time Brolasky asked me the five per cent. I told Mr. Clark, and he acceded to it;" and he says " Mr. Clark allowed $100 for the bonus in *our* settlement. Mr. Brolasky *claimed* $100, and I settled it in that way."

On the other hand, *Jefferson H. Brolasky* testifies that Burk told him " *he* had sold the mortgages to my brother for $1,300;" that " *he* allowed my brother a discount of $100 on these mortgages; the mortgages of Flanagan and Burk & Winebrener;" and that it was a fair business transaction." *Mary Ann Howell*

49

says, "I was present in Philadelphia at Mr. Brolasky's house when William A. Burk called and offered the mortgages to Mr. Brolasky for sale. There were two, to the amount of $1,400; one was for $800, the other for $600. The one of $800 was given to Burk & Winebrener. The other of $600 to Flanagan & Son. He offered the two for $1,300. He said he wanted to raise money very badly, and did not want to mortgage his house. My brother replied that these two mortgages had been offered to him by Robert Smith at $1,300, and he refused to buy them. He persuaded Mr. Brolasky, after some time, to take them at $1,300. He was to have the papers fixed, and Mr. Brolasky was to call upon him and get them." She says, at another time, when at Cape May, "Burk spoke again of the two mortgages, and said he offered them and sold them for $1,300, and he had a right, they were his own, to sell them for $500 if he chose." And again upon another occasion, she says "Mr. Brolasky complained that Mr. Burk had been endeavoring to make the impression on Mr. Miller, that the $100 came out of the $2,800 mortgage; and Mr. Burk said *it did not come out of that mortgage, but out of the two mortgages he sold.*" And *Henry Brolasky* swears that Burk told him "that the $100 was allowed on the two mortgages of $800 and $600; that it was a perfectly fair transaction."

Upon the whole, I am of opinion that the allegation of usury is not sustained by the evidence, and that the decree of the Chancellor should be reversed.

The decree of the Chancellor was unanimously reversed.